**SEEGER WEISS, LLP**
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
Facsimile:  (973) 639-9393
Email: cseeger@seegerweiss.com

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES H. WITCHCOFF, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| CELGENE CORPORATION, ROBERT J. HUGIN, MARK J. ALLES, JACQUALYN A. FOUSE, PETER N. KELLOGG, SCOTT A. SMITH, and TERRIE CURRAN, | |
| Defendants. | |

Plaintiff Charles H. Witchcoff, individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Celgene Corporation ("Celgene" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Celgene common stock between January 12, 2015, and February 27, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Celgene and certain of its senior officers (collectively, "Defendants").

2.     Celgene is a global biopharmaceutical company engaged primarily in the discovery, development, and commercialization of therapies for the treatment of cancer and inflammatory diseases.   The Company operates two primary divisions: (i) "Inflammation and Immunology"; and (ii) "Hematology and Oncology."   Among the Company's core Inflammation and Immunology products is OTEZLA—a drug approved for the treatment of plaque psoriasis and psoriatic arthritis.   Two of the Company's leading development-stage Inflammation and Immunology products during the Class Period were ozanimod—a drug being developed for the treatment of relapsing multiple sclerosis, ulcerative colitis, and Crohn's disease—and GED-0301—a drug being developed for the treatment of Crohn's disease.

3.     In April 2014, the Company acquired GED-0301 from Nogra Pharma Limited for $710 million.  In touting the purchase, Celgene described the drug as a "potentially transformative therapy" that had demonstrated "striking clinical activity in a phase II trial."

4.     The Class Period begins on January 12, 2015, to coincide with the Company's announcement of its 2015 and long-term financial outlook.   Among other things, Celgene announced that it expected 2017 revenues from OTEZLA to be between $1.5 billion and $2.0 billion, and that it expected 2020 revenues from the entire Inflammation and Immunology division to exceed $3.0 billion.

5.      On July 14, 2015, the Company announced that it was acquiring Receptos, Inc. ("Receptos") and its leading development-stage drug, ozanimod, for $7.2 billion.  In touting the acquisition, Celgene emphasized that ozanimod's clinical studies had demonstrated that it has "several areas of potential advantage over existing oral therapies for the treatment of ulcerative colitis (UC) and relapsing multiple sclerosis (RMS), including its cardiac, hepatotoxicity and lymphocyte recovery profile."  To this end, Celgene indicated that the use of ozanimod for the treatment of relapsing multiple sclerosis would be approved by the U.S. Food and Drug Administration ("FDA") in 2018.

6.      On September 12, 2016, the Company released topline data from an interim endoscopy trial for GED-0301 and touted the results as supporting GED-0301's potential as a treatment for Crohn's disease.

7.      On January 9, 2017, the Company released its preliminary 2016 unaudited results and provided financial guidance for 2017.  Specifically, the Company reported $1,017 million in 2016 net product sales for OTEZLA—representing a 116 percent year-over-year increase from 2015—and announced that it expects 2017 OTEZLA net product sales of "[a]pproximately $1.5B to $1.7B"—representing a 57 percent year-over-year increase from 2016.

8.      On October 19, 2017, the Company shocked the market by announcing that it was ending all ongoing trials of GED-0301, would no longer be pursuing GED-0301 as a treatment for Crohn's disease, and would be recording a $1.6 billion impairment charge based on this decision. On this news, the price of Celgene common stock fell $14.63 per share, or nearly 11 percent, from a close of $135.96 per share on October 19, 2017, to a close of $121.33 per share on October 20, 2017.

9.     On October 26, 2017, the Company shocked the market again by announcing that OTEZLA sales in the third quarter of 2017 were only $308 million—representing a 12 percent year-over-year increase—and that it was lowering 2017 OTEZLA net product sales expectations to "[a]pproximately $1.25B."  On this news, the price of Celgene common stock fell $19.57 per share, or more than 16 percent, from a close of $119.56 per share on October 25, 2017, to a close of $99.99 per share on October 26, 2017.

10.     Then, on February 27, 2018, the Company stunned investors a third time by announcing that it had received a Refusal to File letter from the FDA regarding its New Drug Application ("NDA") for ozanimod.  According to Celgene, "[u]pon its preliminary review, the FDA determined that the nonclinical and clinical pharmacology sections in the NDA were insufficient to permit a complete review" of ozanimod.  On this news, the price of Celgene common stock fell $8.66 per share, or more than 9 percent, from a close of $95.78 per share on February 27, 2018, to a close of $87.12 per share on February 28, 2018.

11.     The Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically: (i) Defendants failed to disclose known trends that were negatively impacting sales of OTEZLA; (ii) Defendants overstated the prospects of FDA approval for ozanimod to treat relapsing multiple sclerosis; (iii) Defendants overstated GED-0301's commercial prospects as a treatment for Crohn's disease; and (iv) as a result of the foregoing, Defendants' statements about OTEZLA, ozanimod, and GED-0301 were materially false and/or misleading and/or lacked a reasonable basis.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Celgene is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Celgene's common stock trades in an efficient market on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CELG."

## PARTIES

17.     Plaintiff Charles H. Witchcoff, as set forth in the accompanying certification, incorporated by reference herein, purchased Celgene common stock at artificially inflated prices during the Class Period and has been damaged thereby.

18.     Defendant Celgene is a Delaware corporation with its principal executive offices located at 86 Morris Avenue, Summit, New Jersey.

19.     Defendant Robert J. Hugin ("Hugin") was the Chief Executive Officer of Celgene from the beginning of the Class Period through March 1, 2016.  From March 1, 2016, until his retirement effective February 5, 2018, Hugin was the Executive Chairman of Celgene's Board of Directors.

20.     Defendant Mark J. Alles ("Alles") is the Chief Executive Officer of Celgene (as of March 1, 2016) and the Chairman of Celgene's Board of Directors (as of February 6, 2018).  Prior to March 1, 2016, Alles was the Executive Vice President and Chief Commercial Officer of Celgene.

21.     Defendant Jacqualyn A. Fouse ("Fouse") was President and Chief Operating Officer of Celgene from March 1, 2016, until April 1, 2017.  Prior to March 1, 2016, Fouse was the President of Celgene's Hematology and Oncology division.

22.     Defendant Peter N. Kellogg ("Kellogg") is and, throughout the Class Period, was the Executive Vice President and Chief Financial Officer of Celgene.

23.     Defendant Scott A. Smith ("Smith") is the President and Chief Operating Officer of Celgene (as of April 1, 2017).  Prior to April 1, 2017, Smith was the President of Celgene's Inflammation and Immunology division.

24.     Defendant Terrie Curran ("Curran") is the President of Celgene's Inflammation and Immunology division (as of April 1, 2017).  Prior to April 1, 2017, Curran was the Head of Worldwide Commercial Markets of Celgene's Inflammation and Immunology division.

25.     Defendants Hugin, Alles, Fouse, Kellogg, Smith, and Curran are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Celgene's reports to the SEC, press releases, and presentations to securities analysts, money

portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Celgene is a global biopharmaceutical company engaged primarily in the discovery, development, and commercialization of therapies for the treatment of cancer and inflammatory diseases.

27.     OTEZLA, an oral small-molecule inhibitor of phosphodiesterase 4 (PDE4) specific for cyclic adenosine monophosphate (cAMP), is one of the Company's core Inflammation and Immunology products—generating approximately $472 million in sales in 2015 and $1,017 million in sales in 2016.

28.     OTEZLA was first approved by the FDA in March 2014 for the treatment of adult patients with active psoriatic arthritis and in September 2014 for the treatment of patients with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy.

29.     In January 2015, OTEZLA was approved by the European Commission for the treatment of certain patients with psoriatic arthritis or plaque psoriasis.

30.     Since these initial approvals, OTEZLA has been approved in Japan and certain other international markets for the treatment of psoriatic arthritis or plaque psoriasis in certain patients.

31.     Ozanimod, an oral selective sphingosine 1-phosphate 1 and 5 receptor modulator (S1P), is one of the Company's most important development stage Inflammation and Immunology products.

32.     Ozanimod is not currently approved for any use in any country but is being developed by the Company for treatment of patients with relapsing multiple sclerosis, ulcerative colitis, and Crohn's disease.

33.     GED-0301, an oral antisense DNA oligonucleotide targeting Smad7 mRNA, was one of the Company's most important development stage Inflammation and Immunology products during the Class Period.

34.     GED-0301 is not currently approved for any use in any country but was being developed by the Company during the Class Period for treatment of patients with Crohn's disease.

**Materially False and Misleading Statements Issued During the Class Period Regarding OTEZLA**

35.     The Class Period begins on January 12, 2015, to coincide with the Company's announcement of its 2015 and long-term financial outlook.   Among other things, Celgene announced that it expected 2017 revenues from OTEZLA to be between $1.5 billion and $2.0 billion, and that it expected 2020 revenues from the entire Inflammation and Immunology division to exceed $3.0 billion.

36.     On January 9, 2017, the Company issued a press release to report its preliminary unaudited financial and operational results for 2016.   Therein, the Company reported 2016 net product sales for OTEZLA of $1,017 million—representing a 116 percent year-over-year increase

from 2015.  Commenting on the Company's 2016 financial and operational results, Defendant Alles stated that, "[i]n 2016, we made exceptional progress strengthening and growing our franchises while accelerating and adding to our robust pipeline; our significant business momentum supports raising our 2017 guidance."  With respect to the Company's 2017 outlook, Celgene announced that it expects 2017 OTEZLA net product sales of "[a]pproximately $1.5B to $1.7B"—representing a 57 percent year-over-year increase from 2016.

37.    On January 26, 2017, Defendants continued to tout OTEZLA's growth prospects when the Company issued a press release to report its fourth quarter and full-year 2016 financial and operational results.  Among other things, Celgene reported total OTEZLA sales of $305 million in the fourth quarter and $1,017 million for full-year 2016.  Commenting on the Company's 2016 financial and operational results, Defendant Alles stated that "2016 was an outstanding year of progress strengthening our commercial portfolio and advancing our early-, mid- and late-stage pipeline" and that "[w]e expect our business momentum and significant near-term catalysts to drive high-growth through 2017 and beyond." According to the Company, "OTEZLA® uptake and market share gains continued to accelerate in the fourth quarter in the U.S. with increased contribution from early launch countries in Europe."   To this end, the Company reiterated that it expects revenue from OTEZLA sales in 2017 to be between $1.5 billion and $1.7 billion— representing a 57 percent year-over-year increase from 2016.

38.    On April 27, 2017, Defendants continued to tout OTEZLA's growth prospects when the Company issued a press release to report its first quarter 2017 financial and operational results.  Among other things, Celgene reported total OTEZLA sales of $242 million in the first quarter of 2017—representing a 24 percent year-over-year increase.  According to the Company, "[f]irst quarter U.S. sales of $199 million and international sales of $43 million increased 14

percent and 105 percent, respectively, and were driven by market share gains in the U.S. and continued international launches."  Moreover, the Company reported that "[d]espite a contraction in the overall market volume of prescriptions filled, OTEZLA® share in psoriasis grew versus last quarter."  To this end, the Company reiterated that it expects revenue from OTEZLA sales in 2017 to be between $1.5 billion and $1.7 billion—representing a 57 percent year-over-year increase from 2016.

39.     On July 27, 2017, Defendants continued to tout OTEZLA's growth prospects when the Company issued a press release to report its second quarter 2017 financial and operational results.  Among other things, Celgene reported total OTEZLA sales of $358 million in the second quarter of 2017—representing a 49 percent year-over-year increase.  The Company reported that "[s]ales were driven by increased prescriber adoption and market share gains in the U.S. with increasing contribution from early launch markets in Europe and Japan."  According to Defendant Alles, "[e]xceptional execution of key strategic initiatives strengthened and expanded our opportunities for long-term growth."  To this end, the Company reiterated that it expects revenue from OTEZLA sales in 2017 to be between $1.5 billion and $1.7 billion—representing a 57 percent year-over-year increase from 2016.

40.     The statements contained in ¶¶ 35-39 were materially false and misleading when made because Defendants were: (i) concealing known trends that were negatively impacting sales of OTEZLA; and (ii) as a result of the foregoing, overstating OTEZLA's growth prospects.

**The Truth Begins to Emerge Regarding OTEZLA**

41.     The misleading nature of Defendants' statements was revealed before the market opened on October 26, 2017, when the Company issued a press release to report its third quarter 2017 financial and operational results.  Specifically, Celgene reported total OTEZLA sales of only

$308 million in the third quarter of 2017—representing a 12 percent year-over-year increase.  As explained by the Company, "OTEZLA® sales in the U.S. were impacted by an increase in gross-to-net adjustments from contracts implemented in January and a slowing in overall category growth due to a more challenging market access environment."  As a result, Celgene announced that it no longer expects revenue from OTEZLA sales in 2017 to be between $1.5 billion and $1.7 billion, and now expects revenue from OTEZLA sales in 2017 to be approximately $1.25 billion.

42.      In attempting to explain the significant reduction in OTEZLA sales expectations, Defendant Alles stated that the Company's "2017 forecast assumptions did not adequately anticipate the deep and persistent slowing growth of the psoriatic arthritis and psoriasis markets, especially during the entire third quarter."

43.      In response to the disclosures on October 26, 2017, the price of Celgene common stock declined $19.57 per share, or more than 16 percent, from a close of $119.56 per share on October 25, 2017, to close at $99.99 per share on October 26, 2017.

**Materially False and Misleading Statements Issued During the Class Period Regarding Ozanimod**

44.      On July 14, 2015, Celgene announced that it was acquiring Receptos and its leading development-stage drug, ozanimod, for $7.2 billion.   In touting the acquisition, Celgene emphasized that ozanimod's clinical studies had demonstrated that it has "several areas of potential advantage over existing oral therapies for the treatment of ulcerative colitis (UC) and relapsing multiple sclerosis (RMS), including its cardiac, hepatotoxicity and lymphocyte recovery profile." To this end, Celgene indicated that the use of ozanimod for the treatment of relapsing multiple sclerosis would be approved by the FDA in 2018, stating that "phase III RADIANCE and SUNBEAM RMS trials are ongoing and data are expected in the first half of 2017 to support a [relapsing multiple sclerosis] approval in 2018."

45.     On August 27, 2015, the Company announced the completion of its acquisition of Receptos and continued to tout ozanimod's prospects.  Specifically, Celgene represented that "[t]he acquisition of Receptos significantly enhances Celgene's Inflammation & Immunology (I&I) portfolio, further diversifies the Company's expected revenue beginning in 2019, and builds upon Celgene's growing expertise in inflammatory bowel disease (IBD)" and "adds Ozanimod, a novel, potential best-in-class, oral, selective sphingosine 1-phosphate 1 and 5 receptor modulator (S1P) to Celgene's deep and diverse pipeline of potential disease-altering medicines and investigational compounds."

46.     On February 18, 2016, the Company issued a press release to report the 72-week results from the maintenance phase of the RADIANCE phase II clinical trial of ozanimod. According to the Company, the RADIANCE trial "met its primary efficacy endpoint – reduction in the cumulative number of total gadolinium-enhancing (GdE) lesions determined by MRI, from week 12 to week 24."  Commenting on the results of the trial, Defendant Smith stated that "[t]hese data suggest that ozanimod has the potential to offer a new oral therapeutic option for patients with relapsing multiple sclerosis who seek therapies with different benefit-risk profiles to help manage their chronic disease" and that "[t]he 72-week safety and efficacy results further demonstrate the potential promise of ozanimod."

47.     On September 16, 2016, Celgene issued a press release to report the results from the 96-week blinded extension period of the RADIANCE phase II trial of ozanimod.  Commenting on the results of the trial, Defendant Smith stated that "[t]hese 2-year safety and efficacy results further underscore the potential of ozanimod to offer a new oral therapeutic option for patients with this chronic condition."

48.     On February 17, 2017, the Company issued a press release to report the results of its phase III SUNBEAM trial, evaluating the efficacy and safety of ozanimod.  According to the Company, the SUNBEAM trial "met the primary endpoint in reducing annualized relapse rate (ARR), compared to weekly interferon . . . ."  Commenting on the results of the trial, Defendant Smith stated that "[p]eople living with multiple sclerosis need additional therapies and we are pleased that oral ozanimod showed meaningful improvements across primary and secondary endpoints in this study."

49.     On May 22, 2017, Celgene issued a press release to report the results of its second phase III RADIANCE trial, evaluating the efficacy and safety of ozanimod.  According to the Company, the RADIANCE trial "met the primary endpoint in reducing annualized relapse rate (ARR), compared to weekly interferon . . . ."  According to Defendant Curran, the Company planned to "begin submitting global registration dossiers by the end of [2017] to bring this oral therapy to patients with relapsing multiple sclerosis."

50.     On October 27, 2017, and October 28, 2017, the Company issued a pair of press releases to report the results of its first phase III SUNBEAM trial and its second phase III RADIANCE trial, evaluating the efficacy and safety of ozanimod.  Commenting on the results of the trials, Defendant Curran stated that "[g]iven the totality of the data for ozanimod, we believe that the benefit-risk profile supports pursuing ozanimod as a potential new oral therapeutic option and look forward to filing regulatory submissions in the U.S. by the end of 2017 and in the EU in the first half of 2018."

51.     On January 25, 2018, the Company noted that it had submitted an NDA to the FDA in December 2017 for approval of the use of ozanimod for treatment of relapsing multiple sclerosis.

52.     The statements contained in ¶¶ 44-51 were materially false and misleading when made because Defendants were overstating ozanimod's prospects for approval by the FDA to treat relapsing multiple sclerosis.

### The Truth Begins to Emerge Regarding Ozanimod

53.     The misleading nature of Defendants' statements was revealed after the market closed on February 27, 2018, when the Company issued a press release to announce that it had received a Refusal to File letter from the FDA regarding its NDA for ozanimod.  The Company reported that "[u]pon its preliminary review, the FDA determined that that the nonclinical and clinical pharmacology sections in the NDA were insufficient to permit a complete review."

54.     In response to the disclosures on February 27, 2018, the price of Celgene common stock declined $8.66 per share, or more than 9 percent, from a close of $95.78 per share on February 27, 2018, to a close of $87.12 per share on February 28, 2018.

### Materially False and Misleading Statements Issued During the Class Period Regarding GED-0301

55.     On April 24, 2014, the Company issued a press release to announce it had purchased GED-0301 from Nogra Pharma Limited, a private pharmaceutical company based in Dublin, Ireland.  The Company indicated that a "double-blind, placebo-controlled, multicenter phase II trial of three doses of GED-0301 in 166 patients with active Crohn's disease ha[d] been completed," and "Celgene plans to initiate a phase III registration program by year-end 2014." Defendant Smith lauded GED-0301 as "a potentially transformative therapy that demonstrated striking clinical activity in a phase II trial for Crohn's disease."

56.     On September 12, 2016, the Company issued a press release announcing the release of interim topline data from a randomized, double-blind, multicenter, exploratory phase 1b study evaluating the effects of GED-0301 on both endoscopic and clinical outcomes in patients with

active Crohn's disease.  The Company stated that the topline data "show that in a proportion of patients treated with oral GED-0301 there was endoscopic improvement (defined as a 25 percent improvement from baseline) and clinical response and remission across all treatment groups at week 12."  Defendant Smith stated that "[t]hese data are particularly encouraging for several reasons, including the difficult-to-treat patient population evaluated in the trial."

57.     On November 15, 2016, the Company continued to tout GED-0301 as one of Celgene's most promising treatments and important assets during an analyst conference. Defendant Smith stated that the data Celgene had obtained regarding GED-0301 showed that it is "continuing to work" and that "the drug works in all kinds of different patients."  Defendant Smith further stated that "[t]here's a real opportunity for this to really change the whole shape of the market."

58.     On January 9, 2017, Defendant Alles stated, during an analyst conference, that GED-0301, along with ozanimod and OTEZLA, presented a "fantastic opportunity for [Celgene] to create a multi-billion-dollar add on to [its] current product portfolio."

59.     On May 31, 2017, the Company continued to tout GED-0301 as one of Celgene's most promising treatments and important assets during an analyst conference.  Defendant Alles stated that based on the data the Company had obtained, GED-0301 presented an "enormous opportunity" and that the Company had "high hopes for it commercially." Defendant Alles also stated that GED-0301, along with ozanimod and OTEZLA, would serve as a "replacement" for the lost revenue from REVLIMID sales.

60.     The statements contained in ¶¶ 55-59 were materially false and misleading when made because Defendants were overstating GED-0301's commercial prospects as a treatment for Crohn's disease.

**The Truth Begins to Emerge Regarding GED-0301**

61.     The misleading nature of Defendants' statements regarding the prospects of GED-0301 were revealed on October 19, 2017, when the Company issued a press release stating that it would be discontinuing the GED-0301 trials for the treatment of Crohn's disease following an interim futility analysis by an independent Data Monitoring Committee.  On the same day, the Company filed a Form 8-K with the SEC indicating that it expected to record a $1.6 billion impairment charge as a result of its decision to discontinue its pursuit of GED-0301 as a treatment for Crohn's disease.

62.     In response to the disclosures on October 19, 2017, the price of Celgene common stock declined $14.63 per share, or nearly 11 percent, from a close of $135.96 per share on October 19, 2017, to a close of $121.33 per share on October 20, 2017.

**CLASS ACTION ALLEGATIONS**

63.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Celgene common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, and directors and officers of Celgene, and their families and affiliates.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Celgene common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Celgene and/or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.     Whether the Exchange Act was violated by Defendants;

      b.     Whether Defendants omitted and/or misrepresented material facts;

      c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      e.     Whether the prices of Celgene common stock were artificially inflated; and

      f.     The extent of damage sustained by Class members and the appropriate measure of damages.

66.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

67.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

69.     During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Celgene common stock, as detailed herein, and operated as a fraud or deceit on Class Period purchasers of Celgene common stock by misrepresenting the growth and prospects for the Company's key drug, OTEZLA, by misrepresenting the prospects for approval by the FDA of ozanimod, one of the Company's key development-stage products, and by misrepresenting the commercial prospects of GED-0301 as a treatment for Crohn's disease.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Celgene common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Celgene common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

70.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants: (i) knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; (ii) knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

71.     The Individual Defendants permitted Celgene to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

72.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Celgene, their control over, receipt, and/or modification of Celgene's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Celgene, participated in the fraudulent scheme alleged herein.

73.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Celgene common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Celgene's key drug, OTEZLA, and its growth and prospects, one of Celgene's key development-stage products, ozanimod, and its prospects for approval by the FDA to treat relapsing multiple sclerosis, and GED-0301 and its commercial prospects as a treatment for Crohn's disease, and the intrinsic value of Celgene common stock and caused Plaintiff and members of the Class to purchase Celgene common stock at artificially inflated prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

## FRAUD-ON-THE-MARKET DOCTRINE

74.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.     The omissions and misrepresentations were material;

    c.     Celgene's common stock traded in an efficient market;

      d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Celgene's common stock; and

      e.     Plaintiff and other members of the Class purchased Celgene common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.    At all relevant times, the market for Celgene common stock was efficient for the following reasons, among others: (i) as a regulated issuer, Celgene filed periodic public reports with the SEC; and (ii) Celgene regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

76.    Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

77.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Celgene who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against All Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     During the Class Period, Celgene and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Celgene common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

80.     Celgene and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Celgene common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of Celgene within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.    As set forth above, Celgene and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 3, 2018                    Respectfully submitted,

By:   *s/ Christopher A. Seeger*
**SEEGER WEISS, LLP**
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
Facsimile:  (973) 639-9393
Email:   cseeger@seegerweiss.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Naumon A. Amjed
Ryan T. Degnan
Christopher A. Reese
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Emails:  namjed@ktmc.com
         rdegnan@ktmc.com
         creese@ktmc.com

***Attorneys for Plaintiff***